# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 16-834V
Filed: October 6, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | |
| P.S., | * | To Be Published |
| | * | |
| Petitioner, | * | Motion for Attorneys' Fees and Costs; |
| v. | * | Reasonable Basis; Hepatitis B Vaccine; |
| | * | Connective Tissue Disease ("UCTD"); |
| SECRETARY OF HEALTH | * | Ankylosing Spondylitis; Autoimmune or |
| AND HUMAN SERVICES, | * | Atrophic Gastritis; Significant |
| | * | Aggravation. |
| Respondent. | * | |
| * * * * * * * * * * * * * * * | | |

*Richard Moeller, Esq.*, Moore, Heffernan, et al., Sioux City, IA, for petitioner.
*Voris Johnson, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On July 14, 2016, P.S. ("petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program,[2] alleging that he developed undifferentiated connective tissue disease ("UCTD"), autoimmune or atrophic gastritis, and other injuries which were either caused or significantly aggravated by the hepatitis B vaccinations he received on August 14, 2013, December 17, 2013, and May 16, 2014. *See* Petition ("Pet."), ECF No. 1. A Ruling on the Record and Decision Dismissing the Petition was filed on May 15, 2020. Dismissal Decision, ECF No. 69. The undersigned found that petitioner failed to carry his burden of showing that the hepatitis B vaccines he received caused and/or significantly aggravated his UCTD, autoimmune or atrophic gastritis, or any other injuries. *Id.*

---

[1] This Decision has been formally designated "to be published," which means it will be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

On September 1, 2020, petitioner filed a Motion for Attorneys' Fees and Costs. ECF No. 76 ("Fees App."). On September 8, 2020, petitioner filed a Motion to Amend/Correct the Motion for Attorneys' Fees and Costs. ECF No. 77. On September 11, 2020, respondent filed a response opposing petitioner's motion and arguing that petitioner lacked a reasonable basis in the filing of the petition, never established reasonable basis, and is therefore not entitled to reimbursement for fees and costs. ECF No. 78 ("Response"). Petitioner filed a reply on September 18, 2020, maintaining that the claim had reasonable basis. ECF No. 79 ("Reply"). On January 19, 2021, petitioner filed a Motion to Supplement the Motion for Attorneys' Fees in Costs. ECF No. 80 ("Supp. Fees App.).[3]

Petitioner seeks attorneys' fees and costs in the total amount of **$69,612.42**, representing $46,993.29 in attorneys' fees and costs for petitioner's former counsel, Robert Krakow, Esq., and $22,619.13 in attorneys' fees and costs for petitioner's current counsel, Richard Moeller, Esq., which includes $52.80 in petitioner's costs. ECF Nos. 33, 76, 80.

## I.      Background

### A.  Procedural History

A full and complete recital of the procedural history in this matter is contained in the Decision denying entitlement issued on May 15, 2020 and is incorporated herein and by reference in its entirety. *See* Dismissal Decision, ECF No. 69. Only the elements of procedural history that are pertinent to the Motion for Attorneys' Fees and Costs are contained in this Decision.

On July 14, 2016, P.S. filed a petition. Petition, ECF No. 1.

At a status conference on January 11, 2017, the issues raised in respondent's Rule 4(c) Report were discussed. Scheduling Order at 1, ECF No. 21. Petitioner's counsel advised that he planned to have an expert review the medical records. *Id*. Respondent's counsel raised reasonable basis in the filing of the petition. *Id*. Petitioner was ordered to file an expert report or a status report indicating how he intended to proceed by March 13, 2017. *Id*.

After five extensions, petitioner filed a status report requesting a conference. *See* ECF Nos. 22, 24, 26-29. A status conference was held on December 19, 2017. After a full discussion of the issues, petitioner's counsel advised he had done all he could to secure an expert but was unsuccessful and planned to withdraw as counsel. Scheduling Order at 1, ECF No. 30. After further discussion, an Order was issued for counsel to file a Motion for Attorneys' Fees and Costs and a Motion to Withdraw as Counsel by February 2, 2018. *Id*. at 2.

Petitioner filed additional medical records on February 1, 2018. Pet. Ex. 14-15, ECF Nos. 31-32. Petitioner's counsel filed a Motion for Interim Fees and Costs and a Motion to Withdraw as Counsel on February 2, 2018. ECF Nos. 33-34. Respondent filed his response to petitioner's Motion for Attorneys' Fees and Costs on February 13, 2018, raising reasonable basis, and

---

[3] As more specifically discussed in the Procedural History, a Motion for Interim Attorneys' Fees and Costs ("Interim Fees App.") was filed by petitioner's original counsel, but ruling was deferred when respondent raised reasonable basis in response to that Motion. *See* Order Deferring Ruling on Interim Attorneys' Fees and Costs, ECF No. 42.

petitioner filed a reply on March 20, 2018. ECF Nos. 36, 41. Based on the filings, the undersigned deferred ruling on the Motion for Interim Attorneys' Fees and Costs until after entitlement was decided and granted the Motion to Withdraw as counsel. *See* Order, ECF No. 42; Order, ECF No. 43. The docket then reflected petitioner as *pro se*.

On May 18, 2018, Mr. Moeller substituted as counsel. ECF No. 47. Petitioner filed additional medical records through July 2, 2018. *See* Pet. Ex. 28-30, ECF No. 49; Pet. Ex. 31, ECF No. 50.

At the first status conference with Mr. Moeller on July 24, 2018, Mr. Moeller advised he had secured an expert who was willing to review the medical records. *See* Scheduling Order at 1, ECF No. 52. In a discussion of various issues, petitioner's counsel was reminded that reasonable basis had been raised by respondent and reimbursement of attorneys' fees and costs was not guaranteed. *Id.* Petitioner was ordered to file an expert report or a status report by October 22, 2018. *Id.* at 2. On October 22, 2018, petitioner filed a status report advising that he did not have an expert report and requesting another status conference. ECF No. 53.

At a status conference held on December 6, 2018, petitioner's counsel advised that neither he nor petitioner were financially capable of paying the costs of an expert. *See* Scheduling Order at 1, ECF No. 54. Petitioner believed the Vaccine Program should retain an expert for him. Mr. Moeller was reminded it was petitioner's burden to prove his case and retain an expert when necessary. *Id.* The various ways to exit the Program were discussed and counsel was ordered to discuss the options with petitioner and file a status report as to how he would like to proceed. *Id.* at 2.

On February 4, 2019, petitioner filed additional medical records. Pet. Ex. 32, ECF No. 55. He also filed a status report requesting a ruling on the record that should include a "thorough review of the medical records filed in this matter, as well as injuries claimed to have been sustained following the receipt of the allegedly causal vaccinations, and petitioner's claims of ongoing injuries and damages…." ECF No. 56.

Petitioner was ordered to file his Motion for Ruling on the Record by April 5, 2019. *See* Non-PDF Order, Feb. 4, 2019.

Additional records were filed on April 3, 2019. Pet. Ex. 33, ECF No. 58. Petitioner filed updated medical records and a Motion for Ruling on the Record on April 12, 2019. Pet Ex. 34-44, ECF No. 60-61. Respondent filed a response on April 22, 2019. ECF No. 62.

On May 3, 2019, petitioner filed a Motion for Extension of Time to file a reply. Petitioner further requested "that the special master suspend her consideration and ruling on petitioner's motion for ruling on the record" to allow petitioner time to submit his medical records to a potential expert, Dr. Shoenfeld, for review Motion at 1, ECF No. 63. Respondent filed a response objecting to petitioner's Motion on May 8, 2019, stating, "Petitioner has had over two-and-a-half years since respondent filed his Rule 4(c) Report to have Dr. Shoenfeld (or some other expert) offer a causal opinion in support of his claim." ECF No. 64.

The undersigned granted the Motion for Extension of Time, ordering petitioner to file an expert report by June 19, 2019, and a Motion to Withdraw his Motion for Ruling on the Record by June 4, 2019. *See* Order at 2, ECF No. 65.

Petitioner filed a status report on June 13, 2019 advising that he would not be withdrawing his original Motion for Ruling on the Record and would not be filing an expert report from Dr. Shoenfeld. ECF No. 67.

A detailed decision dismissing the petition was issued on May 15, 2020. ECF No. 69.

Petitioner filed a Motion for Attorneys' Fees and Costs on September 1, 2020 and a Motion to Amend/Correct the Motion for Attorneys' Fees and Costs on September 8, 2020. On September 11, 2020, respondent filed his response opposing the motion for fees and costs, raising reasonable basis, and asking that no fees or costs be paid. Petitioner filed a reply and Motion to Supplement on September 18 and 19, 2020 respectively. ECF Nos. 76-80.

This decision was deliberately held until the issuance of *James-Cornelius v. Sec'y of Health & Human Servs.,* 984 F.3d 1374, 1379–81 (Fed. Cir. 2021) for purposes of some clarity in assessing reasonable basis.

### B. Petitioner's Health Prior to the Hepatitis B Vaccines

A complete and detailed medical history is contained in the decision dismissing the petition issued on May 15, 2020 and is incorporated herein by reference, however pertinent portions of petitioner's medical history is included for purposes of discussing reasonable basis. ECF No. 69.

Petitioner has a past medical history which includes gastrointestinal and rectal issues and anal fistula.[4] Pet. Ex. 2 at 3-5; Pet. Ex. 1 at 12, 18-21, 161, 169, 171, 197, 203, 205, 209; Pet. Ex. 12 at 4. He also has a history of dermatological issues including itching and hair loss at the root, mild erythema[5] and scaling, scattered papules and pustules with a diagnosis of cutis xerosis[6], urticaria[7], seborrheic dermatitis, male pattern hair loss, and folliculitis. Pet. Ex. 1 at 15-16. He was treated with Triamcinolone ointment,[8] Allegra, Atarax,[9] medicated shampoo, Rogaine, and Panoxyl bar soap. *Id.*

---

[4] An anal fistula is "a cutaneous fistula opening on the body surface near the anus; it may or may not communicate with the rectum." *Anal fistula*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 704 (33rd ed. 2019) [hereinafter "DORLAND'S"].

[5] Erythema means "redness of the skin." *Erythema*, DORLAND'S 636.

[6] Cutis xerosis is also known as "asteatotic eczema." *Xerosis cutis*, DORLAND'S 2056. It is "a condition resulting from excessive dehydration of the skin, characterized by erythema, dry scaling, fine cracking, and pruritus; it occurs chiefly during cold weather when low humidity in heated rooms causes excessive water loss from the stratum corneum." *Asteatotic eczema*, *id.* at 586.

[7] Urticaria is "a vascular reaction in the upper dermis, usually transient, consisting of localized edema caused by dilatation and increased capillary permeability with wheals." *Urticaria*, DORLAND'S 1981.

[8] Triamcinolone acetonide is an ester of triamcinolone, a synthetic glucocorticoid, applied topically to the skin or oral mucosa as an anti-inflammatory. *Triamcinolone acetonide*, DORLAND'S 1929.

[9] Atarax is the brand name for hydroxyzine hydrochloride, which is used as an antianxiety agent, antiemetic, and in urticaria and other manifestations of allergic dermatoses. *Atarax*, DORLAND'S 167; *hydroxyzine hydrochloride*, *id.* at 873.

### C.  Petitioner's Health After the First Hepatitis B Vaccine

Petitioner received three hepatitis B vaccinations on August 14, 2013, December 17, 2013, and May 16, 2014, respectively.

On August 14, 2013, petitioner presented to Dr. Landen for follow up after a recent ER visit. Pet. Ex. 3 at 139-142; Pet. Ex. 13 at 9-12. Petitioner was advised that he needed to receive the hepatitis B vaccine series. Pet. Ex. 3 at 141. Dr. Landen documented that petitioner wanted to come back for the hepatitis B vaccine "on Friday."[10] *Id.* at 142. Other records reflect August 14, 2013 as the date of the first hepatitis B vaccine. Pet. Ex. 1 at 177.

Petitioner presented for medical care unrelated to his alleged hepatitis B-related injuries in September 2013. There were no complaints raised related to the August 14, 2013 vaccine. Pet. Ex. 3 at 137.

No records were filed for any medical visits between September 5, 2013 and December 17, 2013, and no complaints of any adverse events following the August 14, 2013 hepatitis B vaccine were documented during that timeframe.

### D.  Petitioner's Health After the Second Hepatitis B Vaccine

On December 17, 2013, petitioner received a second hepatitis B vaccine. Pet. Ex. 1 at 177. No records of any medical care or records specifically related to any complications or adverse events associated with the December 17, 2013 hepatitis B vaccination were filed between December 17, 2013 and May 16, 2014.

### E.  Petitioner's Health After the Third Hepatitis B Vaccine

On May 16, 2014, petitioner received a third hepatitis B vaccine. Pet. Ex. 1 at 176.

There were no records filed for any medical care from May 16, 2014 until February 19, 2015, when petitioner presented for a sore throat, cough, and concern about left-sided abdominal pain he had the week prior that had since improved. Pet. Ex. 3 at 131. Abdominal ultrasound and liver function tests were ordered. *Id.* at 135.

Three months later, on May 18, 2015, petitioner presented for medical care for mid-back and neck pain. Pet. Ex. 3 at 126. He reported receipt of a hepatitis B vaccine in May 2014, left knee pain in June 2014, and a cold in February 2015 that lasted for 10 days rather than his usual one to three days. *Id.* In May 2015, he developed left-sided neck, upper back, and spine pain which was initially severe but lessened when he started swimming. *Id.*  His pain was now a 3/10, worse in the morning but better as the day went on. *Id.* He reported "last night" he felt transient electric shocks when he moved his extremities while asleep, his head was "shivering," and he could not sleep. *Id.* The doctor wrote:

---

[10] "Friday" would be August 16, 2013. There are no records of a medical visit on this date.

> [Petitioner's] main concern is that he assumes all these above event (sic) which happened are related to adverse reaction caused from his last hepatitisvaccination. (sic) he informs me that he reviewed a number [of] articles which relayed similar symptoms after the vaccination he is worried about "weakened immune system, transvermyelitis, (sic) MS[11], requests blood test, MRI of spine, brain, knee" to avoid worsening injury to his spine or worsening assumed side effects from vaccination[.]

Pet. Ex. 3 at 127. Petitioner reported a cracking noise in his neck when he turned to the right but no neck pain, upper or lower extremity weakness, trouble walking, bowel or bladder issues, sensory abnormalities, visual issues, or hearing loss. *Id*. The doctor wrote:

> I am unable to relate his symptoms/clinical conditions as an adverse effect to hepatitis B vaccination, infact (sic) I am unaware of this at this time. But based on his symptoms and normal neurological exam there is no indication for MS or Transever (sic) myelitis. I am not aware of what caused the transient electric shock like symptoms last night. At this time I recommend no further tests or imaging unless symptoms become more frequent/worsening/progressing. I encouraged him to keep a log of his symptoms and if they become frequent or recurrent to inform us. He seem (sic) dissatisfied with the answer today, I suggested that he discuss with his PCP Dr Salser about this.

Pet. Ex. 3 at 130.

On May 23, 2015, petitioner presented to UAB Emergency Department with paresthesia.[12] Pet. Ex. 1 at 336-341, 349-350. He described "pain in back, left eyelid flickering, hearing crackling when he turn (sic) neck, 'shock' type sensations at times in extremities at night, spots of itching on legs, left knee pain, numbness in arms and fifth...finger at times when he awakens." *Id.* at 342. He reported onset of these symptoms after receipt of hepatitis B vaccine. *Id.* The differential diagnosis was listed as "Peripheral neuropathy vs MS vs other neurological condition vs anxiety." *Id*. at 349. A "[p]hysical exam reveal[ed] no significant findings" and his CT scan was normal. *Id.* at 349-350, 354-55. He was instructed to follow up with a neurologist. *Id*. at 350.

On May 29, 2015, petitioner returned to his primary care physician, Dr. Salser, reporting neck pain and bilateral arm "shocks" and numbness. He reported that the neck pain started on the left side in May 2014, followed by a "paralytic attack" and inability to get out of bed on May 16, 2014. On May 17, 2014, he "began to have electric shock sensation followed by numbness in bilateral hands and arms." Pet. Ex. 3 at 120-121. He had a recent upper respiratory illness that lasted for 10 days, which attributed to a compromised immune system due to the hepatitis B vaccine. Pet. Ex. 13 at 24-25. Dr. Salser wrote petitioner was "very convinced" there is a

---

[11] Transverse myelitis is an inflammation of the spinal cord in which the functional effect of the lesions spans the width of the entire cord at a given level. *Transverse myelitis*, DORLAND'S 1201. Multiple sclerosis is "a disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter; symptoms usually include weakness, incoordination, paresthesia, speech disturbances, and visual complaints. The course of the disease is usually prolonged, so that the term *multiple* also refers to remissions and relapses that occur over a period of many years…the etiology is unknown." *Multiple sclerosis*, *id*. at 1653.

[12] Paresthesia means "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus" *Paresthesia*, DORLAND'S 1362.

connection between the vaccines and all of his musculoskeletal problems and neurological complaints and was becoming frustrated with the delay of "necessary tests" to diagnose him. *Id.* at 29. Petitioner's behavior was described as "Agitated, Belligerent, Compulsive, Pressured speech" and "Abnormal/Psychotic thoughts: Ideas of influence, Misinterpretations, Obsessions" were noted. *Id.* at 27.

Petitioner presented to a neurologist on June 2, 2015, concerned about transverse myelitis connected to the hepatitis B vaccine. Pet. Ex. 13 at 32. He brought a written chronology of his symptoms. *Id.* at 32-36. Neurological exam was normal. *Id.* at 37-38. The record reflects that petitioner reported his review of literature suggested he has suffered adverse effects from the vaccine and seems "very convinced" that his symptoms are related to the vaccine. *Id.* at 38. His "symptoms localize poorly" and the doctor did not believe they were related to the hepatitis B vaccine. *Id.*

An MRI of his cervical spine with and without contrast on June 11, 2015 revealed mild degenerative changes with no cord compression and a disc extrusion contacting the spinal cord at the T1-2 level. Pet. Ex. 12 at 9-10. An MRI of the thoracic spine on June 23, 2015 also revealed the disc extrusion at T1-2. There were no appreciable cord signal abnormalities. *Id.* at 11-12.

On June 26, 2015, petitioner returned to Dr. Salser with a host of complaints which included generalized joint and nerve pain, numbness and weakness in the arms and hands, fatigue, and shortness of breath. Pet. Ex. 13 at 42-43. He was still working out, walking, and running daily despite his knee pain. *Id.* at 42. A blood panel including an intrinsic factor antibody[13] test was ordered and was negative. *Id.* at 46-47. Petitioner was diagnosed with fatigue and vitamin B12 deficiency. *Id.* at 46.

Petitioner reported some improvement from vitamin B12 and D supplements. Pet. Ex. 13 at 49; *see also* Pet. Ex. 3 at 102. He was concerned about the etiology of his vitamin B12 deficiency and still felt fatigued with diffuse joint pain. He was still concerned his symptoms may be a presentation of MS and requested additional studies. Pet. Ex. 13 at 49-50. The record notes petitioner having "significant focus and concern on his symptoms" and "reading a lot about them and has many questions and theories, including the association with his last HBV vaccine." *Id.* at 52-53. The neurologist noted that most of his symptoms could be explained by his vitamin B12 deficiency, and it was "reinforced that there's no evidence of MS since this is one of his main concerns." *Id.* Testing for pernicious anemia[14] was suggested and somatization[15] and somatoform[16]

---

[13] Intrinsic factor antibody is used to diagnose pernicious anemia, one of the main causes of vitamin B12 deficiency. *Intrinsic factor antibody (IF ab)*, *Mosby's Manual of Diagnostic and Laboratory Tests* 199 (Pagana eds., 6th ed. 2018) [hereinafter *Mosby's*].

[14] Pernicious anemia is a chronic progressive anemia of older adults, occurring more frequently during the fifth and later decades, due to failure of absorption of vitamin B12, usually resulting from a defect of the stomach and associated with lack of secretion of "intrinsic factor." It is characterized by numbness and tingling, weakness, and a sore smooth tongue, as well as dyspnea after slight exertion, faintness, pallor of the skin, anorexia, diarrhea, weight loss, and fever. *Pernicious anemia*, STEDMAN'S MEDICAL DICTIONARY 36730, accessed via westlaw.com (last visited September 19, 2022) [hereinafter "STEDMAN'S"].

[15] Somatization is "the conversion of mental experiences or states into bodily symptoms." *Somatization*, DORLAND'S 1705.

[16] Somatoform is a term used to describe "physical symptoms that cannot be attributed to organic disease and appear to be of psychic origin." *Somatoform*, DORLAND'S 1705.

disorders, stress, and anxiety were entertained as possible causes and contributors to petitioner's symptoms. *Id.*

Petitioner underwent an MRI of his left knee on July 6, 2015, which was unremarkable. Pet. Ex. 12 at 13-14.

On July 8, 2015, petitioner sought care at UAB's gastrointestinal clinic for "ongoing fatigue and subjective weakness in his arms." Pet. Ex. 13 at 54-55. The record notes,

[h]is B12 deficiency is due to pernicious anemia (autoimmune gastritis[17]) – low B12 level combined with an elevated parietal cell antibody. We explained to him that negative intrinsic factor antibody can be seen with pernicious anemia. Since starting B12 supplementation his neurologic symptoms have improved.

Pet. Ex 13 at 58. Petitioner was instructed to continue supplementing with vitamin B12. *Id.*

Petitioner continued to present with complaints of worsening elbow joint crepitus,[18] polyarthralgia,[19] pain in his thumb when moving his right hand, chronic knee pain, and left knee crepitus. Pet. Ex. 13 at 59, 63. He was referred to a rheumatologist. *Id.* at 63. Petitioner continued with care for ongoing atrophic gastritis,[20] multiple myalgias, and arthralgia. Pet. Ex. 1 at 44, 47.

Petitioner presented to a rheumatologist on July 23, 2015 with complaints of body fatigue, knee pain, and elbow pain. His hepatitis B series was noted. Pet Ex. 1 at 34-35; Pet. Ex. 3 at 84-85. No evidence of inflammatory arthritis was found. Pet. Ex. 1 at 39. An MRI confirmed mild osteoarthritis,[21] but the doctor saw no connection between the hepatitis B vaccine and osteoarthritis. *Id.*

Petitioner's gastroenterologists attributed his anemia to hypochlorhydria[22] from autoimmune gastritis and/or pernicious anemia. Pet. Ex. 1 at 32.

Petitioner presented to Dr. Salser on August 12, 2015, his neurologist on August 18, 2015, and Dr. Salser again on September 8, 2015, insistent that his ongoing joint problems were related to his hepatitis B vaccines. Pet. Ex. 3 at 64, 59. His EMG results and physical exam were normal. *Id.* at 62-63. An MRI of the brain with and without contrast performed on August 26, 2015 showed no demyelinating disease or acute intracranial abnormality. Pet. Ex. 12 at 15-16. Petitioner's physical examinations were normal, though he continued to express concern that his symptoms

---

[17] Gastritis is an "inflammation of the stomach." *Gastritis*, DORLAND'S 754.

[18] Joint crepitus is "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." *Joint crepitus*, DORLAND'S 424.

[19] Polyarthralgia is pain in many different joints. *Polyarthralgia*, DORLAND'S 1464; *arthralgia*, *id*. at 154.

[20] Atrophic gastritis is a "type of chronic nonerosive gastritis characterized by infiltration of the lamina propria by inflammatory cells, similar to superficial gastritis but involving the entire mucosa. The amount of chief cells and parietal cells decreases, lymphoid nodules may be present, the total thickness of the mucosa decreases, and intestinal metaplasia may develop." *Atrophic gastritis*, DORLAND'S 754.

[21] Osteoarthritis is a "noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Osteoarthritis*, DORLAND'S 1326.

[22] Hypochlorhydria is a "deficiency of hydrochloric acid in the gastric juice." *Hypochlorohydria*, DORLAND'S 889.

were the result of 'hepatitis B vaccine injury,'" stating "I feel the autoimmune reaction," as well as "twitching of the muscles." Pet. Ex. 3 at 70, 76. He requested muscle and synovial biopsies to investigate his symptoms and demanded a consult with Dr. Chatham, the clinical director of rheumatology. *Id.* at 76.

Petitioner continued to express concern that his ongoing symptoms were related to a hepatitis B vaccine he received in 2013 and complained that "[n]obody [was] helping [him] discover the diagnosis on this." Pet. Ex. 3 at 53.

Dr. Chatham examined petitioner on October 12, 2015. Pet. Ex. 3 at 42. Petitioner reported being in good health until the past year, when he began to experience increasing difficulties with joint pain, muscle twitches, and crepitation in his neck, elbows, shoulders, and knees with generalized myalgia and weakness that significantly interfered with function. *Id.* Dr. Chatham wrote, "[petitioner] has had numerous serologic as well as imaging evaluations done in the past year all of which have been unrevealing for any evidence of acute phase response, autoantibody titer elevations, rheumatoid factor elevation or any evidence of inflammatory changes referable to his knees." *Id.* Additionally, all MRIs have been unremarkable. *Id.* at 42-43. Dr. Chatham noted that "[i]t is possible his arthralgias were accentuated by adjuvants in the administered HBV vaccine, but there is no objective evidence of chronic joint inflammation presently. Current objective findings on exam and imaging are all easily explained by evolving osteoarthritis." *Id.* at 46. Petitioner tested positive for HLA-B27, which is a gene found in 90% of patients with ankylosing spondylitis. *Id.* at 47; *see also Histocompatibility complex*, STEDMAN'S at 194270. Dr. Chatham prescribed sulfasalazine.[23] *Id.*

On October 15, 2015, petitioner presented to Dr. Salser for ongoing knee, elbow, and shoulder pain. Pet. Ex. 3 at 37. He reported a "twitching" sensation in both upper arms and expressed interest in seeing an integrative medicine physician. *Id.*

Petitioner returned to Dr. Salser on November 18, 2015.  He had a sore throat after taking sulfasalazine for 10 days and stopped the medication, though it "seemed to help muscle twitching and stiffness in neck." Pet. Ex. 3 at 105. The record notes, "Patient feels this is connected to his HLA B27 and Hep B vaccination." *Id.* at 106.

Petitioner presented for care on December 22, 2015 for neck and knee pain. Pet. Ex. 3 at 25. He was concerned about an adjuvant reaction to the hepatitis B vaccine and requested his aluminum level be checked. *Id.* Bloodwork was ordered. *Id.* at 29-30.

On January 29, 2016, petitioner returned to Dr. Chatham for "[s]uspected (undifferentiated) spondyloarthropathy."[24] Pet. Ex. 3 at 19. Petitioner complained of ongoing myalgia but stated that his overall joint pain had improved, though crepitation of the left elbow and both knees was still present. *Id.* Laboratory results were "unremarkable." *Id.* at 24.

---

[23] Sulfasalazine is an antibacterial sulfonamide used orally r rectally in the prophylaxis and treatment of inflammatory bowel disease, and orally as a disease-modifying antirheumatic drug in the treatment of rheumatoid arthritis. *Sulfasalazine*, DORLAND'S 1771.
[24] Spondyloarthropathy is a "[d]isease of the joints of the spine." *Spondyloarthropathy*, DORLAND'S 1725.

Petitioner continued to present with ongoing pain in his elbow, knee, neck, and upper shoulder as well as "muscle fatigue" which "[c]omes and goes". Pet. Ex. 3 at 13-14. The record notes, "did literature search – Vitamin D helps with symptoms of Hepatitis B Vaccine." *Id*. At the request of the petitioner, autoimmune tests were reordered. *Id*. at 17.

At a February 26, 2016 visit with the neurologist, petitioner complained of intermittent muscle fatigue. Pet. Ex. 3 at 7-8. He reported pain in the left side of his body the week prior from his shoulder to his upper hip. *Id*. at 8. He reported having short-term memory loss after receiving a hepatitis B vaccination which had improved since that time. *Id*. Petitioner worried he could have macrophagic myofasciitis[25] associated with aluminum adjuvants. The doctor wrote, "he again focuses on how this could be Hep vaccine and the adjuvants in the vaccine." *Id*. Petitioner advised that he was taking cilantro and chlorella supplements to counteract aluminum toxicity. *Id*. Petitioner further expressed concern for myopathy secondary to the hepatitis B vaccine and presented related literature. *Id*. at 11. He was assured there was no evidence of myopathy on the EMG, no need for a muscle biopsy, and no evidence of MS. His symptoms were thought to be caused by a significant vitamin B12 deficiency. *Id*. There was no objective neurological evidence that petitioner developed an autoimmune reaction after the hepatitis B vaccination, and there was concern for somatization or somatoform disorder. Petitioner refused counselling. *Id*.

At petitioner's visit to Dr. Salser on March 18, 2016, he complained of chronic fatigue and multiple musculoskeletal complaints, including "tissue discomfort" on the left side of his body, "which he relates to receiving 'all 3 Hep B injections in my left arm.'" Pet. Ex. 3 at 1. He was worried about hair loss he claimed began after the hepatitis B vaccinations. *Id*. at 2. The record notes continued insistence that the hepatitis B vaccinations caused his injury and his need for treatment plans. *Id*. at 6.

On April 12, 2016, petitioner returned to Dr. Chatham complaining of possible gluten sensitivity, left-side chest wall pain, and ocular discomfort. Pet. Ex. 13 at 68. His joint pain had improved, and he did not have joint swelling, though crepitation was noted in the left elbow. *Id*. He was diagnosed with myalgias and osteoarthritis of the neck, knee, and left elbow. *Id*. at 72. Possible uveitis[26] was noted. *Id*.

On May 31, 2016, petitioner presented to Dr. Gewin, a family and internal medicine specialist, reporting multiple rheumatologic complaints and diagnoses of pernicious anemia, atrophic gastritis, positive HLA-B27, vitamin B12 deficiency, and "undifferentiated connective tissue disease by his rheumatologist Dr. Chatham." Pet. Ex. 15 at 5. He questioned whether these problems were caused by the hepatitis B vaccine. *Id*. He described worsening hair loss and itching and wanted testing for celiac disease and Hashimoto's thyroiditis. *Id*. His bloodwork revealed normal TSH, normal antibodies, and normal tissue transglutaminase. *Id*. at 4.

---

[25] Myofasciitis is an "inflammation of a muscle and its fascia, particularly of the fascial insertion of muscle to bone." *Myofasciitis*, DORLAND'S 1205.

[26] Uveitis is "an inflammation of part or all of the uvea, commonly involving the other tunics of the eye (sclera, cornea, and retina)." *Uveitis*, DORLAND'S 1983.

Petitioner returned to Dr. Chatham on July 26, 2016, with ongoing myalgias and occasional fasciculations.[27] Pet. Ex. 13 at 76. Overall, his joint pain had improved. *Id.* An x-ray of his elbow was normal. *Id.* at 83. Dr. Chatham observed early signs of osteoarthritis of the knee and left elbow. *Id.* at 79. Petitioner was noted to be "[t]olerating sulfasalazine well." *Id.* at 76.

Petitioner returned to Dr. Gewin on August 19, 2016, with worsening arthralgias in his left elbow and knee. He related this to the hepatits B vaccines because they were given when he had extreme pruritis, crepitus, and pain in his joints. Pet. Ex. 15 at 5. Dr. Gewin noted a possible immune response to the vaccines, including arthralgias and allergic dermatitis that had since resolved. *Id.* He ordered a rheumatoid profile with serologic markers, including sedimentation rate[28] and CRP.[29] *Id.* The bloodwork revealed negative ANA,[30] abnormally low ferritin,[31] normal rheumatoid factor, and normal TSH. *Id.* at 6.

Petitioner returned to Dr. Gewin on August 26, 2016 and reported that decreasing vitamin D supplements resulted in more pain and spasticity in his joints. Pet. Ex. 15 at 4. Petitioner was instructed to continue the vitamin D supplements with a plan to check his vitamin D 25-hydroxy level at his next appointment. *Id.* Petitioner apparently did not return to Dr. Gewin as no further records were filed.

On August 29, 2016, petitioner presented to Dr. Nozaki at the UAB Neuromuscular Clinic for an opinion on whether the hepatitis B vaccine caused him to develop myopathy. Pet. Ex. 13 at 84-85. Petitioner reported having contacted a physician in France who believed the hep B vaccination can cause MS and myopathy. *Id.* at 84. Petitioner was concerned he could have macrophagic myofasciitis from the aluminum adjuvants in the vaccine. *Id.* at 85. He complained of "off and on" muscle fatigue. *Id.* On examination, he had normal strength, sensory response, and DTRs.[32] *Id.* at 87. There was no evidence of myalgias, rashes, or joint swelling. *Id.* Dr. Nozaki concluded petitioner may have had a systemic autoimmune reaction to the vaccine, but ongoing myopathy was unlikely due to his normal strength and lack of myalgia. *Id.* at 88.

On October 14, 2016, petitioner returned to Dr. Chatham, who noted "suspected (undifferentiated) spondyloarthropathy." Pet. Ex. 19 at 137.

Petitioner then presented to Dr. McLain, internal medicine specialist, on December 14, 2016, reporting that he had UCTD, positive HLA-B27, joint pain, and a "Hepatitis B vaccine

---

[27] Fasciculations are small local contractions of muscles, visible through the skin, representing a spontaneous discharge of a number of fibers innervated by a single motor nerve filament. *Fasciculation*, DORLAND'S 675.

[28] Sedimentation rate is a non-specific test used to detect illnesses associated with acute and chronic infection, inflammation, and tissue necrosis or infarction. *See Mosby's* at 199.

[29] C-reactive protein ("CRP") is a protein used to indicate an inflammatory illness. It is elevated in patients with a bacterial infectious disease, tissue necrosis, or an inflammatory disorder. A positive test result indicates the presence, but not the cause, of the disease. *See Mosby's* at 165-66.

[30] Antinuclear antibodies ("ANA") are used to diagnose systemic lupus erythematosus and other autoimmune diseases, including but not limited to RA, polymyositis, scleroderma, infectious mononucleosis, and myasthenia gravis. *Mosby's* 80-83.

[31] Ferritin is one of the chief forms in which iron is stored in the body. *Ferritin*, DORLAND'S 682.

[32] "DTR" stands for deep tendon reflex. *DTR*, STEDMAN'S at 267760. Deep tendon reflexes are involuntary contractions of skeletal muscle that occur as a result of stimulation of stretch receptors in the muscles. *Deep tendon reflex*, *id.* at 767400; *myotatic contraction*, *id.* at 201140.

reaction." Pet. Ex. 28 at 1. Dr. McLain wrote he has "a number of symptoms that he links to hepatitis B vaccination." *Id.* at 5. Petitioner was taken off sulfasalazine and placed on Plaquenil.[33] *Id.*

On January 31, 2017, petitioner returned to Dr. Chatham, for "suspected (undifferentiated) spondyloarthropathy." Pet. Ex. 19 at 114. He continued to suffer from knee and elbow arthralgia, crepitation of the left elbow and both knees, and stiffness in his elbow. He was tolerating sulfasalazine and feeling better overall, minimizing gluten in his diet, and adhering to a regular exercise program. *Id.* Dr. Chatham's impression was myalgia and cervical, knee, and left elbow osteoarthritis. *Id.* at 118.

On February 3, 2017, petitioner underwent an MRI of his left elbow to evaluate for synovitis[34] and enthesitis.[35] Pet. Ex. 19 at 110. The MRI was "essentially unremarkable." *Id.*

Petitioner then presented to an allergist on April 11, 2017 for itchy legs, skin rash, knee and elbow discomfort, intermittent eye discomfort, hair loss, and atrophic gastritis connected to the hepatitis B vaccine. Pet. Ex. 29 at 2. Petitioner had no sensitivity to corn, egg white, milk, peanut, soybean, or wheat. *Id.* at 1. Zyrtec was recommended to aid with itching. *Id.* at 2.

On referral by Dr. Chatham, petitioner presented to Callahan Eye Clinic on April 13, 2017. Pet. Ex. 18 at 1. He complained of seeing halos around lights and pain around his eyes, but no ocular etiology was found. *Id.* at 5. The pain was attributed to dry eyes or sinus problems. *Id.*

Petitioner returned to Dr. Chatham on April 25, 2017. Pet. Ex. 19 at 87. He was concerned that he had an allergy to proteins. Petitioner believed that all his medical problems arose from the HBV vaccine. *Id.*

On May 7, 2017, Dr. Chatham sent an email to petitioner which stated: "Subject: RE: Chatham, Walter Winn – Rheumatology: Diagnosis – Right elbow crepitation in 2015. As previously stasted (sic) your diagnosis (sic) are: seronegative spondyloarthropathy[36] osteoarthritis of the cervical spine, knees." Pet. Ex. 14.[37]

On August 7, 2017, petitioner presented to a new gastroenterologist, Dr. Wilcox, reporting numerous complaints "link[ed]…to a series of hepatitis B injections in 2015." Pet. Ex. 19 at 57. Petitioner was "concerned about 'leaky gut' caused by the vaccination." Dr. Wilcox was unable to "link any of his complaints to some specific bowel disease." *Id.* at 62. Petitioner requested an

---

[33] Plaquenil is the brand name for hydroxychloroquine sulfate, which is used as an anti-inflammatory disease-modifying antirheumatic drug in treatment of rheumatoid arthritis. *Plaquenil*, DORLAND'S 1434; *hydroxychloroquine sulfate*, *id*. at 870.

[34] Synovitis is "inflammation of a synovial membrane; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." *Synovitis*, DORLAND'S 1826.

[35] Enthesitis is "inflammation of the muscular or tendinous attachment to bone." *Enthesitis*, DORLAND'S 620.

[36] Ankylosing spondylitis, also referred to as seronegative spondyloarthropathy, is "a general term comprising a number of degenerative joint diseases having common clinical, immunologic, pathologic, and radiographic features, including synovitis of the peripheral joints, enthesopathy, bony ankylosis of the large peripheral joints, lack of rheumatoid factor, and, in many cases, a positive status for the human leukocyte antigen HLA-B27." *Seronegative spondyloarthropathy*, DORLAND'S 1724.

[37] The request to Dr. Chatham that resulted in this email was not filed.

investigation into inflammatory bowel disease and Dr. Wilcox ordered tissue transglutaminase and antiparietal cell antibody panels. *Id.* Tissue transglutaminase was negative and anti-gastric parietal cell antibodies were positive. Dr. Wilcox concluded the result "may reflect the presence of atrophic gastritis." *Id.* at 62-64.

A flexible sigmoidoscopy performed on January 5, 2018 showed minimal amounts of chronic inflammation, skin tags, and a healed fistula. There was minor irritation at the dentate line, but no bleeding present. Petitioner was advised to use fiber supplements. Pet. Ex. 19 at 7-10.

Petitioner continued to seek care through 2018. In January 2019, petitioner returned to Callahan Eye Clinic for pain behind the left eye and light sensitivity. Pet. Ex. 32 at 1. He "believe[d] these symptoms are related to dx (sic) of Ankylosing spondylitis that he developed after receiving a Hep B vaccine." *Id.* He was diagnosed with keratoconjunctivitis sicca[38] and myopia[39] with presbyopia[40] in both eyes. *Id.* at 4.

At a February 26, 2019 visit to Callahan Eye Clinic, the assessment included ankylosing spondylitis, unspecified site of spine; HLA-B27 positive; history of assisted *in situ* keratomileusis; blepharitis[41] of both eyes, unspecified eyelid, unspecified type; and keratoconjunctivitis sicca of both eyes. Pet. Ex. 33 at 4. The plan was to return as needed. *Id.*

No further medical records were filed.

### F.   Letters from Dr. W. Winn Chatham, Professor of Medicine

On March 8, 2018, Dr. Chatham submitted a letter with the salutation "To whom it may concern."[42] Pet. Ex. 17 at 1. Dr. Chatham wrote he first examined petitioner on October 12, 2015, when petitioner presented with a history of symmetric joint pain and stiffness referable to his elbows, knees, and cervical spine. *Id.* Petitioner reported his symptoms developed subsequent to "initiation of an immunization series with Hepatitis B vaccine." *Id.* An evaluation was negative for serologic evidence for developing rheumatoid arthritis or a lupus-related autoimmune disease. *Id.* Petitioner was confirmed to be a positive HLA-B27 carrier, and he also had iron deficiency and a history of previous rectal fistula. *Id.* Possible developing spondyloarthropathy related to inflammatory bowel disease was considered, but inflammatory bowel disease was not confirmed after an extensive work-up. *Id.* There were no skin lesions to implicate developing psoriatic arthritis and no history of gastrointestinal or genitourinary infection to implicate developing reactive arthritis. *Id.* Due to the above and recent symptoms of inflammatory lower back pain, petitioner was being treated with sulfasalazine and NSAIDs for developing spondyloarthropathy, which, at the time, was most consistent with ankylosing spondylitis. *Id.* Dr. Chatham concluded

---

[38] Keratoconjunctivitis sicca is "a condition marked by hyperemia of the conjunctiva, lacrimal deficiency, thickening of the corneal epithelium, itching and burning of the eye, and often reduced visual acuity." *Keratoconjunctivitis sicca*, DORLAND'S 968.

[39] Myopia is "an error of refraction in which rays of light entering the eye parallel to the optic axis are brought to focus in front of the retina, as a result of the eyeball being too long from front to back, or of an increased strength in refractive power of the media of the eye." *Myopia*, DORLAND'S 1207.

[40] Presbyopia is "impairment of vision due to advancing years or to old age." *Presbyopia*, DORLAND'S 1488.

[41] Blepharitis is "inflammation of the eyelids." *Blepharitis*, DORLAND'S at 221.

[42] To whom or why this letter was written is unclear.

that because petitioner's symptoms had only been present for three years, he had not yet developed any radiographic footprints characteristic of this disorder. *Id.*

On April 27, 2018, Dr. Chatham generated a second letter, again directed "To whom it may concern." Pet. Ex. 30. He wrote:

> This patient continues to be followed in the UAB Rheumatology Clinic for developing ankylosing spondylitis that presented with seronegative symmetric arthritis, axial pain, stiffness in the context of HLA-B27 positive haplotype. He presented to our clinic with this complex of symptoms in 2015 following initiation of immunization with hepatitis B vaccine in 2014. As such, it is more likely than not that the vaccine triggered the onset of his disease.

Pet. Ex. 30.

## G. Affidavit of Pradeep Sharma

The only affidavit submitted by petitioner was filed at the end of the Petition. Petitioner affirmed that the statements contained in the Petition are true except where the statements are made "upon information and belief," in which case he believes they are true based on the information "now available to me." Pet. at 13, ECF No. 1.

## II. Arguments Regarding Petitioner's Motion for Attorneys' Fees and Costs

### A. Respondent's Argument

Respondent argues that petitioner failed to establish a reasonable basis for his claim and is legally precluded from receiving a discretionary award of fees and costs. Response at 4, ECF No. 78. Respondent added that the Act provides that a special master may not award compensation "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). To "have a 'reasonable basis,' a claim must, at a minimum, be supported by medical records or medical opinion." *See Everett v Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Spec. Mstr. Feb. 7, 1992). Response at 4.

Relying on *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632 (Fed. Cir. 2017), respondent argued that a reasonable basis must exist for the claim before the special master may exercise her discretion in awarding attorneys' fees. Response at 5. *Simmons* clarified that the question of reasonable basis "is an objective inquiry unrelated to counsel's conduct." *Id.* "The binding effect of *Simmons* is clear: the reasonable basis analysis must focus on whether there is evidentiary support for the essential elements of the claim set forth in the petition, not whether counsel acted reasonably in filing the petition." *Id.*

Respondent argues that based on *Simmons,* this matter lacks and never possessed a reasonable basis, since petitioner provided no evidence of a reliable medical theory, a logical sequence of cause and effect, or a medically appropriate temporal relationship, "all of which are required elements of his *prima facie* case. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d

1274, 1278 (Fed. Cir. 2005)." Further, petitioner did not have a defined and recognized injury. Response at 6; *see* Decision Dismissing Petition at 29, ECF No. 69.

Referring to Mr. Moeller, respondent argued that counsel was on notice that reasonable basis had been raised, there was a need for an expert report, and that respondent maintained his position that there was a lack of reasonable basis to proceed in this matter. Response at 6; *see* Scheduling Order, ECF No. 52. Respondent added that by agreeing to represent petitioner, current counsel "assumed the risk that he would not be able to establish a reasonable basis for his claim." *Id*. (citing *Carter v. Sec'y of Health & Human Servs.*, No. 15-1030, 2017 WL 490427, at *4 (Fed. Cl. Jan. 10, 2017)) (finding no reasonable basis in a case where the medical records clearly failed to support vaccine-causation, holding that petitioner's counsel was on notice that an expert would be necessary), *aff'd*, 132 Fed. Cl. 372 (2017); *see also Murphy v. Sec'y of Health & Human Servs.*, 30 Fed. Cl. 60, 62 (1993) (holding that "an attorney should be able to distinguish a case that has reasonable underpinnings from one that does not. Rather than waste the court's time and efforts, an attorney should use reasoned judgment in determining whether to accept and pursue a claim."), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995).

In opposition to Mr. Krakow's requests for fees and costs, respondent submits that counsel's withdrawal because he had "done all he could do for petitioner at this point in time", was "a tacit admission that the claim had no merit." Response to Mot. to Withdraw at 5, ECF No. 36.

Respondent concluded that petitioner failed to establish a reasonable basis for his claim and an award of attorneys' fees and costs should be denied. Response at 6.

## B. Petitioner's Argument

Petitioner detailed his initial representation by Mr. Krakow, highlighting Mr. Krakow's filing of the petition, his inability to secure an expert, and the filing for interim fees and costs that was opposed by respondent, who argued reasonable basis was lacking. Mr. Krakow withdrew as counsel. Fees App. at 2-3, ECF No. 76. Petitioner noted that the Court deferred ruling on the Motion for interim fees and costs until entitlement was determined, and petitioner was afforded sixty days to secure alternate counsel or file a status report on his progress in doing so. *Id.* at 2.

Petitioner contacted Mr. Moeller and presented Petitioner's Exhibit 30, a letter from Dr. Chatham, which stated it was "more likely than not that the vaccine triggered his ankylosing spondylitis." Response at 4. It is petitioner's position that as of April 27, 2017, the medical records "reasonably and objectively appeared to (a) reflect a definitive diagnosis for his injuries (ankylosing spondylitis) and (b) a medical opinion (albeit not an explanation of a theory or mechanism) that its onset was probably triggered by the hepatitis b vaccinations he received." *Id.*; Pet. Ex. 17; Pet. Ex. 30. Mr. Moeller substituted in as counsel on that basis and contacted several experts including Dr. Gershwin, who agreed to review the matter. Response at 4. Dr. Gershwin noted Dr. Chatham's reputation in the field of rheumatology and agreed with his diagnosis of "spondyloarthropathy associated disease." *Id*. at 5. However, Dr. Gershwin did not issue an expert report and no report from any expert was ever filed. Petitioner then sought a Ruling on the Record and was found not entitled to compensation. Dismissal Decision, ECF No. 69.

Petitioner argues that sufficient evidence exists in the record to show that petitioner did not suffer from ankylosing spondylitis prior to the hepatitis B vaccinations and the medical evidence in Dr. Chatham's two letters[43] was "sufficient to persuade the special master that 'an Althen analysis is appropriate.'" Fees App. at 7, citing Dismissal Decision, ECF No. 69 at 29.[44]

Petitioner argues that when he presented to Mr. Moeller, he had both medical records that he had not yet filed that showed, *inter alia*, a definitive diagnosis of ankylosing spondylitis, and the opinion of Dr. Chatham that the onset was probably triggered by the hepatitis B vaccinations he received. Fees App. at 4, 7-9. According to petitioner, under *Cottingham on Behalf of K.C. v. Sec'y of Health & Human Servs.*, No. 2019-1596, 2020 WL 4810095, at *6 (Fed. Cir. 2020), there was "more than a mere scintilla but less than a preponderance of proof" providing sufficient grounds for reasonable basis to be found. *Id*. at 7. Further, petitioner argues that the medical literature he submitted supports that it can take 8 to 11 years between the first symptoms of ankylosing spondylitis and its definitive diagnosis. ECF. *Id*. at 10; Pet. Ex. 21 at 2.

In his Reply, petitioner pointed out that the basis of respondent's argument that petitioner lacked reasonable basis was a lack of support for the essential elements of the claim—that petitioner failed to provide a reliable medical theory, logical sequence of cause and effect, or medically appropriate temporal relationship—all of which are required elements of his prima facie case under *Althen* and that he did not establish a defined and recognized injury. Reply at 1, ECF No. 79; Response at 4-6. Petitioner argues that this misstates *Simmons*, upon which respondent relied, "because reasonable basis does not depend upon whether there is evidentiary support for each of the elements of *Althen*, but whether there is 'more than a mere scintilla but less than a preponderance of proof' of the feasibility of a claim." Reply at 2. Petitioner further noted that respondent failed to cite to *Cottingham*, which requires a totality of the circumstances analysis. *Id*.

Petitioner further noted that respondent failed to mention the letter and medical evidence provided by Dr. Chatham,[45] or that Dr. Gershwin agreed with Dr. Chatham's diagnosis of spondyloarthropathy associated disease, even if he was unwilling to write a report, or that literature "shows that the onset and course of petitioner's illness is consistent with a diagnosis of post vaccination ankylosing spondylitis…". Reply at 2.[46] Petitioner argued that whether Dr. Chatham's letters were sufficient for a finding of entitlement under an *Althen* analysis is not determinative of whether they were sufficient under *Cottingham* to support reasonable basis for the claim. *Id*. at 3.

Petitioner further noted that respondent did not oppose the fees and costs submitted by his counsel, but rather argued that when counsel took on representation, he assumed the risk that he would not be able to establish reasonable basis. Petitioner added that this a risk in every case and is not a determinative factor on whether there was reasonable factual basis for the claim. Reply at 5 (citing *Simmons*, 875 F.3d at 636).

---

[43] *See* Pet. Ex. 17; Pet. Ex. 30.
[44] The *Althen* analysis in the Ruling on the Record and Dismissal Decision is not commentary by the undersigned on the sufficiency of Dr. Chatham's letters to support reasonable basis. Rather, the letters were accordingly considered in that Decision for purposes of determining entitlement, as they were offered by a treating physician and the closest evidence offered of a theory on causation.
[45] Dr. Chatham's letters are filed as Pet. Ex. 17 and Pet. Ex. 30.
[46] Reference is made to the Ruling on the Record and Dismissal Decision finding against entitlement regarding the findings and weight of the literature submitted.

Petitioner concluded that while respondent argued the issue of reasonable basis in opposing fees and costs herein, his argument shifted the inquiry to whether there is sufficient evidence to satisfy the *Althen* criteria, which is an improper argument under *Simmons*, *Cottingham*, and others. Reply at 5.

### III.    Discussion

The Vaccine Act mandates that special masters shall award reasonable attorneys' fees and costs related to any petition that results in an award of compensation. § 15(e)(1). Even if compensation is not awarded, the special master may award reasonable fees and costs if, in the determination of the special master, the petition was brought in good faith and with a reasonable basis. *Id.* If the special master has not yet made a determination on entitlement, she may still award reasonable attorneys' fees and costs on an interim basis. *See Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008); *see also Mazmanian v. Sec'y of Health & Human Servs.*, No. 18-1153V, 2020 WL 618549 (Fed. Cl. Spec. Mstr. Jan. 14, 2020).

"Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646, at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2011).

"Reasonable basis," however, is an objective standard. Unlike the good faith inquiry, reasonable basis requires more than just petitioner's belief in her claim. *See Turner*, 2007 WL 4410030, at *6. Instead, a reasonable basis analysis "may include an examination of a number of objective factors, such as the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018); *accord Cottingham ex rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337 (Fed. Cir. 2020). "More than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham,* 917 F.3d at 1346.

In the instant case, the undersigned has no basis to believe, and respondent does not argue, that petitioner did not bring his claim in good faith. Therefore, the undersigned finds that the petitioner brought his claim in good faith.

In discussing the reasonable basis requirement, the Federal Circuit stressed in *Cottingham* the prima facie petition requirements of § 11(c)(1) of the Act. *Cottingham*, 971 F.3d at 1345-46. Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

(1) received a vaccine listed on the Vaccine Injury Table;

(2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
(3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
(4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
(5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

Consistent with the above, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating: (1) that petitioner received a covered vaccine; (2) that the vaccine was administered in the United States; (3) that petitioner experienced symptoms he alleges are associated with his vaccine; and (4) that these symptoms persisted for at least six months.

Respondent, however, disagrees that the claim was brought with a reasonable basis. Response at 1, 4. Respondent argues that petitioner failed to satisfy the *Althen* criteria in that he failed to provide a causal theory, a logical sequence of cause and effect, and a temporal association between the hepatitis B vaccines and his alleged injuries. *Id*. at 6.

Petitioner is correct that a decision on attorneys' fees and costs is based on whether the claim was brought with a reasonable basis, not the standards for entitlement as described in *Althen*. An examination of the medical records shows that when the petition was filed, petitioner was actively seeking medical care and answers for the health issues he was experiencing, and he was convinced that all his health issues were related to his hepatitis B vaccine. However, Mr. Krakow was unable to secure an expert based on the medical records during the tenure of his representation. In relieving Mr. Krakow, the undersigned deferred ruling on his Motion for interim fees and costs because respondent raised reasonable basis. But, in so doing and as the order reflected, petitioner was given the opportunity to continue his active search for answers for his health issues. *See* Order Deferring Ruling on Interim Attorneys' Fees and Costs, ECF No. 42

To that end, petitioner ultimately came under the care of Dr. Chatham on October 12, 2015, who noted that none of petitioner's serologic testing or imaging showed any acute phase response, autoantibody titer elevations, rheumatoid factor elevation, or any evidence of inflammatory changes: "[i]t is possible his arthralgias were accentuated by adjuvants in the administered HBV vaccine, but there is no objective evidence of chronic joint inflammation presently. Current objective findings on exam and imaging are all easily explained by evolving osteoarthritis". Pet. Ex. 3 at 42-43, 46. Petitioner tested positive for HLA-B27, which is a gene found in 90% of patients with ankylosing spondylitis.[47] *Id*. at 47. Dr. Chatham prescribed sulfasalazine. *Id*.

From that visit onward, Dr. Chatham referred to petitioner as having "suspected (undifferentiated) spondyloarthropathy.[48]" Pet. Ex. 3 at 19; Pet. Ex. 19 at 137; Pet. Ex. 19 at 114.[49]

---

[47] *see also Histocompatibility complex*, STEDMAN'S at 194270
[48] Spondyloarthropathy is a "[d]isease of the joints of the spine." *Spondyloarthropathy*, DORLAND'S at 1725.
[49] These records are from January 29, 2016, October 14, 2016, and January 31, 2017, respectively.

In an email sent on May 7, 2017 to petitioner Dr. Chatham wrote "As previously stasted (sic) your diagnosis(sic) are: seronegative spondyloarthropathy[50] osteoarthritis of the cervical spine, knees." Pet. Ex. 14.[51]

Dr. Chatham then generated two letters, the first dated March 8, 2018, in which he wrote that he first examined petitioner on October 12, 2015 when petitioner presented with a history of symmetric joint pain and stiffness referable to his elbows, knees, and cervical spine subsequent to "initiation of an immunization series with Hepatitis B vaccine." Pet. Ex. 17 at 1. The evaluation was negative for serologic evidence for developing rheumatoid arthritis or a lupus-related autoimmune disease. *Id*. He was confirmed to be a positive HLA-B27 carrier and had iron deficiency and a history of previous rectal fistula. *Id*. Developing spondyloarthropathy related to inflammatory bowel disease was considered but not confirmed after an extensive work-up. *Id*. There were no skin lesions to implicate developing psoriatic arthritis nor was there any history of gastrointestinal or genitourinary infection to implicate developing reactive arthritis. *Id*. Due to the above and recent symptoms of inflammatory lower back pain, he was being treated with sulfasalazine and NSAIDs for developing spondyloarthropathy, most consistent with ankylosing spondylitis. *Id*. Dr. Chatham concluded that his symptoms had only been present for three years, so he had not yet developed any radiographic footprints characteristic of this disorder. *Id*.

In a second letter, dated April 27, 2018, Dr. Chatham wrote:

> This patient continues to be followed in the UAB Rheumatology Clinic for developing ankylosing spondylitis that presented with seronegative symmetric arthritis, axial pain, stiffness in the context of HLA-B27 positive haplotype. He presented to our clinic with this complex of symptoms in 2015 following initiation of immunization with hepatitis B vaccine in 2014. As such, it is more likely than not that the vaccine triggered the onset of his disease.

Pet. Ex. 30.

Further, Dr. Gewin and Dr. Nozaki documented that the hepatitis B vaccines may have played a role in petitioner's health issues. At his visit with Dr. Gewin on August 19, 2016, Dr. Gewin noted a possible immune response to the vaccines with arthralgias and initial allergic dermatitis that had since resolved. Pet. Ex. 15 at 5. On August 29, 2016, Dr. Nozaki wrote that petitioner may have had a systemic autoimmune reaction to the vaccine, but ongoing myopathy was unlikely due to his normal strength and lack of myalgia. Pet. Ex. 13 at 88.

Petitioner's inability to satisfy the criteria for entitlement is irrelevant here. The opinions of Dr. Chatham, Dr. Gewin, and Dr. Nozaki are "more than a mere scintilla" of evidence to satisfy

---

[50] Ankylosing spondylitis, also referred to as seronegative spondyloarthropathy, is "a general term comprising a number of degenerative joint diseases having common clinical, immunologic, pathologic, and radiographic features, including synovitis of the peripheral joints, enthesopathy, bony ankylosis of the large peripheral joints, lack of rheumatoid factor, and, in many cases, a positive status for the human leukocyte antigen HLA-B27." *Seronegative spondyloarthropathy*, DORLAND'S at 1725.

[51] The request to Dr. Chatham that resulted in this email was not filed.

reasonable basis. *Cottingham,* 971 F.3d at 1346. As pointed out by petitioner, allegations of vaccinations being causally associated with ankylosing spondylitis have come before the court on rare occasion, with decisions both in favor and against petitioners. *See, e.g.*, *Stacy v. Sec'y of Health & Human Servs.*, No. 10-449V, 2016 WL 3040671, at *1 (Fed. Cl. Spec. Mstr. 2016); *Godfrey v. Sec'y Health & Human Servs. Health & Human Servs.*, 2016 WL 6080798, at *1 (Fed. Cl. Spec. Mstr. 2016).

For these reasons, the undersigned finds that this petition had a reasonable basis during the pendency of this matter.

### IV.    Reasonable Attorneys' Fees and Costs

### A. Reasonable Attorneys' Fees

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. Id. at 1348.

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours, including those by paralegals, that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id.* at 1522. Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009). A special master need not engaged in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011).

### 1.    Attorneys' fees and costs for Mr. Moeller, Esq.

Petitioner requests attorneys' fees and costs for Moore, Corbett, Heffernan, Moeller & Meis, LLP in the amount of **$22,619.13** representing $19,722.15 in attorneys' fees, $344.18 in attorneys' costs, $2,500.00 in expert costs for Dr. Gershwin, and $52.80 in petitioner's out-of-pocket costs.

### a.  Reasonable Hourly Rates

Petitioner requests the following hourly rates for the attorneys at Moore, Corbett, Heffernan, Moeller & Meis, LLP that worked on this matter:

**Richard Moeller – Attorney**
2018: $285.00
2019: $300.00
2020: $341.00

**Nikki K. Nobbe – Attorney**
2018: $190.00

Petitioner also requests the following hourly rates for the paralegals who assisted Mr. Moeller and Ms. Nobbe:

**Melissa A. Jones (MAJ) – Paralegal**
2018: $75.00
2019: $85.00
2020: $95.00

**Ursula U Runge (UUR) – Paralegal**
2018: $75.00

The undersigned finds that the requested rates are reasonable and consistent with what Mr. Moeller, Ms. Nobbe, and their paralegals have previously been awarded for their Vaccine Program work. *See Galpin v. Sec'y of Health & Human Servs.*, No. 17-588V, 2022 WL 4115313 (Fed. Cl. Spec. Mstr. Aug. 11, 2022); *Zielinski v. Sec'y of Health & Human Servs.*, No. 18-1075V, 2021 WL 1115823 (Fed. Cl. Spec. Mstr. Feb. 23, 2021). Therefore, the undersigned awards the requested rates.

### b.  Hours Reasonably Expended

It is well-established that an application for fees and costs must sufficiently detail and explain the time billed so that a special master may determine, from the application and the case file, whether the amount requested is reasonable. *Bell v. Sec'y of Health & Human Servs.*, 18 Cl. Ct. 751, 760 (1989). Petitioner bears the burden of documenting the fees and costs claimed.

Upon review of the submitted billing records, the timesheet entries are sufficiently detailed for an assessment to be made of the entries' reasonableness, and the undersigned finds the time billed to be reasonable. Accordingly, petitioner is awarded attorneys' fees of **$19,722.15** for the attorneys and paralegals at Moore, Corbett, Heffernan, Moeller & Meis, LLP.

### c.  Reasonable Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable.

*Perreira v. Sec'y of Health & Human Servs.,* 27 Fed. Cl. 29, 34 (Fed. Cl. 1992). Petitioner requests $344.18 in costs including medical records and postage charges, and $2,500.00 in expert fees for Dr. Gershwin. Pet. Ex. 47. Petitioner also requests $52.80 in costs for securing records from UAB. Pet. Ex 16, Tabs 4-5.

### i.   Expert Fees

Petitioner's counsel requests $2,500.00 in expert fees for Dr. Gershwin. Petitioner's counsel submits that he engaged the services of Dr. Gershwin with a $2,500.00 retainer advanced by petitioner. Fees App. at 16. Dr. Gershwin voluntarily refunded the petitioner the $2,500.00. *Id.* at 17. Though petitioner disagrees that Dr. Gershwin's fee be paid, petitioner's counsel submits that Dr. Gershwin provided excellent services in this case and should be paid accordingly. *Id.* Dr. Gershwin's invoice reflects that he spent 7.5 hours reviewing the medical records in this matter but, as a courtesy, only billed for 5 hours at $500.00 per hour, a rate he has routinely been paid by the Program.

The undersigned finds Dr. Gershwin's invoice to be reasonable and awards $2,500.00 to Dr. Gershwin for his expert services in this matter.

### ii.   Petitioner's Costs

Pursuant to General Order No. 9, petitioner affirmed that he incurred out-of-pocket costs of $52.80 in acquiring medical records. Fees App. at 1; Pet. Ex. 16, Tabs 4-5. The undersigned finds that these costs are sufficiently documented, and petitioner is thus entitled to reimbursement of $52.80 for his out-of-pocket costs.

### iii.   Total Reasonable Costs

The undersigned has reviewed all other requested costs, finds them reasonable and supported with adequate documentation, and awards them in full. Accordingly, petitioner is entitled to **$2,896.98** in total costs for the time petitioner was represented by Mr. Moeller, representing $344.18 for miscellaneous costs, $52.80 for petitioner's out-of-pocket costs, and $2,500.00 for Dr. Gershwin's expert fees.

### 2.   Attorneys' Fees and Costs for Mr. Krakow, Esq.[52]

Petitioner requests attorneys' fees and costs for the Law Office of Robert Krakow, P.C. in the amount of **$46,993.29**, representing $43,200.00 in attorneys' fees and $3,793.29 in total costs including $2,000.00 in expert fees for Dr. Shoenfeld[53] and $52.80 for petitioner's out-of-pocket-costs.

---

[52] Moving forward, Mr. Krakow is cautioned to be more vigilant in reviewing timelines and medical records in reviewing potential cases.

[53] Mr. Krakow represented that he did not have an invoice from Dr. Shoenfeld. Motion for Interim Attorneys' Fees and Costs at 20, ECF No. 33.

### a.  Hourly Rates

Petitioner relies on the Motion for Interim Attorneys' Fees and Costs Mr. Krakow filed while he was counsel of record. As discussed above, ruling on that Motion was deferred until after entitlement due to respondent raising reasonable basis in opposition to the Motion. ECF. No. 33 ("Interim Fees App."). Petitioner requests the following hourly rates for Mr. Krakow:

**Robert Krakow – Attorney**
2016: $425.00
2017: $435.00
2018: $435.00

For tasks normally associated with paralegal work that he performed himself, Mr. Krakow billed at a rate of $125.00 in 2016 and $140.00 in 2017.

In a supplemental submission, Mr. Moeller filed additional bills on behalf of Mr. Krakow for attorneys' fees accrued by Mr. Krakow between his filing of the Motion for Interim Attorneys' Fees and Costs in February 2018 and when he was relieved as counsel in April 2018. The submission detailed the number of medical records that he filed on petitioner's behalf during that timeframe and his drafting and filing of a 21-page memorandum and legal brief opposing respondent raising reasonable basis in his response to the Motion for Interim Attorneys' Fees and Costs. Mr. Krakow submitted a rate of $450 for this additional work done in 2018. Supp. Fees App., ECF No. 80.

The undersigned finds that the requested rates for Mr. Krakow are reasonable and in accordance with what he has previously been awarded for his Vaccine Program work. *See R.S. v. Sec'y of Health & Human Servs.*, No. 18-1488V, 2022 WL 854901 (Fed. Cl. Spec. Mstr. Feb. 17, 2022); *Ayyasolla v. Sec'y of Health & Human Servs.*, No. 16-989V, 2022 WL 354458 (Fed. Cl. Spec. Mstr. Jan. 11, 2022). The undersigned therefore awards the requested rates.

### b.  Hours Reasonably Expended

Upon review of the submitted billing records, the timesheet entries are sufficiently detailed for an assessment to be made of the entries' reasonableness, and the undersigned finds the time billed to be reasonable. Accordingly, petitioner is awarded attorneys' fees of **$43,200.00** for Mr. Krakow.

### c.  Reasonable Costs

Petitioner requests a total of $3,793.29, representing $3,740.49 for attorneys' costs including medical records, photocopying, postage charges, and expert fees for Dr. Shoenfeld, and $52.80 for petitioner's out-of-pocket costs. Pet. Ex. 16, Tabs 2, 4, 5.

### i.  Expert Costs

Petitioner submitted that Dr. Shoenfeld's review in this case cost $2,000.00. However, petitioner was unable to provide an invoice to show the hourly rate charged by Dr. Shoenfeld or a description of the work performed. No invoice from Dr. Shoenfeld has been filed since the Motion for Interim Attorneys' Fees and Costs was filed. Without an invoice, this expenditure cannot be paid. Petitioner's costs are therefore **reduced by $2,000.00.**

### ii.   Total Reasonable Costs

The undersigned has reviewed all other requested costs and finds them reasonable and supported with adequate documentation. However, as petitioner's out-of-pocket costs of $52.80 were also included in Mr. Moeller's submission and already awarded above, that amount will be subtracted here. Thus, petitioner is awarded **$1,740.49**[54] in total costs for the time he was represented by Mr. Krakow.

### V.   Conclusion

Based on the foregoing, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED, in part.** The undersigned finds that it is reasonable to compensate petitioner and his counsel for **total attorneys' fees and costs of $67,559.62,** representing $19,722.15 in fees and $2,896.98 in costs[55] for Mr. Moeller, and $43,200.00 in fees and $1,740.49 in costs for Mr. Krakow.

Accordingly, the undersigned awards:

> **A lump sum payment of $67,559.62, representing reimbursement for petitioner's attorneys' fees and costs in the form of a check payable jointly to petitioner and his counsel of record, Mr. Richard Moeller of Moore, Corbett, Heffernan, Moeller & Meis, LLP, to be distributed pursuant to the findings contained in this decision as to Mr. Krakow and petitioner, respectively.**

The Clerk of Court is directed to enter judgment in accordance with this Decision.[56]

**IT IS SO ORDERED.**

s/Mindy Michaels Roth
Mindy Michaels Roth
Special Master

---

[54] $3,793.29 (total costs) – $2,000.00 (Dr. Shoenfeld's fee) – $52.80 (petitioner's costs) = $1,740.49.
[55] Petitioner's out-of-pocket costs of $52.80 are included in this amount.
[56] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.